# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| ROBERT AND DONNA KOON D/B/A EDGE-WOOD DAIRY, individually and on behalf of all those similarly situated,<br><br>      *Plaintiff*,<br><br>     v.<br><br>NUTRIEN LTD.;<br>NUTRIEN AG SOLUTIONS;<br>THE MOSAIC CO.;<br>MOSAIC FERTILIZER, LLC;<br>CANPOTEX LTD.;<br>CF INDUSTRIES HOLDINGS, INC.;<br>CF INDUSTRIES, INC.;<br>KOCH, INC. F/K/A KOCH INDUSTRIES, INC.;<br>KOCH AG & ENERGY SOLUTIONS, LLC;<br>KOCH FERTILIZER LLC;<br>KOCH AGRONOMIC SERVICES, LLC;<br>YARA INTERNATIONAL ASA;<br>YARA NORTH AMERICA, INC.,<br><br>      *Defendants*. | Civil Case No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**CONTENTS**

I.  INTRODUCTION ..................................................................................................4

II.  PARTIES .........................................................................................................7

    A.  Plaintiffs..............................................................................................7

    B.  Defendants ...........................................................................................7

        1.  Nutrien .....................................................................................7

        2.  Mosaic......................................................................................8

        3.  Canpotex...................................................................................8

        4.  CF Industries..............................................................................8

        5.  Yara.........................................................................................9

        6.  Koch.........................................................................................9

    C.  AGENTS AND CO-CONSPIRATORS ...........................................................10

        1.  OCI Global...............................................................................10

        2.  BHP ........................................................................................11

        3.  Trade Associations.....................................................................12

III.  JURISDICTION AND VENUE .................................................................................13

IV.  FACTUAL ALLEGATIONS ...................................................................................14

    A.  NPK Fertilizers ....................................................................................14

        1.  Nitrogen Fertilizers ....................................................................14

        2.  Phosphate Fertilizers..................................................................16

        3.  Potash Fertilizers......................................................................16

    B.  Defendants' Conspiracy Caused Significant Price Increases to NPK Fertilizers ............................................................................................16

    C.  Recent Price Inflation of the NPK Fertilizer Market Does Not Align with Market Trends.......................................................................................20

    D.  Increases in natural gas prices indicate only a nominal correlation to rising and sustained NPK Fertilizer costs ...........................................................23

    E.  The U.S. NPK Fertilizer Market is Marked by Indicia of Collusion....................26

2

F. Defendants exchange confidential, competitively sensitive, proprietary information through IFA and TFI .................................................................26

    1. IFA ...........................................................................................................26

    2. The Fertilizer Institute.............................................................................29

G. The NPK Fertilizer market is characterized by inelastic demand.........................32

H. The NPK Fertilizer market has high barriers to entry...........................................33

I. Nitrogen fertilizer products are highly homogenous ............................................33

J. Defendants also have motive and the opportunity to collude ...............................33

K. Defendants' coordinated activity suggests the formation of an NPK Fertilizer cartel ...................................................................................................35

L. Plaintiffs and the Class Have Suffered Antitrust Injuries.....................................36

V. CLASS ALLEGATIONS ................................................................................................37

VI. MARKET POWER AND DEFINITION ..........................................................................40

    A. VII. TOLLING OF THE STATUTE OF LIMITATIONS ....................................43

VII. CLAIMS FOR RELIEF...................................................................................................43

COUNT I ......................................................................................................................................43

VIII. DEMAND FOR JUDGMENT .......................................................................................45

IX. JURY DEMAND ............................................................................................................46

3

Plaintiffs Robert and Donna Koon d/b/a Edge-Wood Dairy ("Plaintiffs"), individually and on behalf of themselves and all others similarly situated, bring this action against Defendants Nutrien Ltd., Nutrien AG Solutions, The Mosaic Company, Mosaic Fertilizer, LLC, Cantopex Ltd., CF Industries Holdings, Inc., CF Industries, Inc., Koch, Inc. formerly known as Koch Industries, Inc., Koch Ag & Energy Solutions, LLC, Koch Fertilizer, LLC; Koch Agronomics Services, LLC, Yara International, ASA, and Yara North America, Inc. (collectively, "Defendants") and allege as follows:

## I. INTRODUCTION

1. Defendants are a collection of the largest fertilizer companies that produce, manufacture, supply, and sell fertilizers that use (individually or in combination) nitrogen (N), potash (P), and phosphate (K) for agricultural cultivation (referred to collectively in this Complaint as "NPK Fertilizers".

2. Defendants control approximately 82% of the nitrogen fertilizer market, 90-95% of the potash fertilizer market, and approximately 91% of the phosphate fertilizer market in the United States.

3. Starting on or around January 1, 2020, Defendants entered into an agreement, combination, or conspiracy to limit the supply and fix, raise, maintain, or stabilize prices of NPK Fertilizers sold in the United States at supracompetitive levels. Plaintiffs and the Class have paid artificially inflated prices for NPK Fertilizers for over six years as a result of Defendants' unlawful conduct.

4. Defendants' agreement and the conspiracy in furtherance thereof have enabled Defendants to increase their profit margins exponentially, while forcing Plaintiffs and Class Members to pay inflated prices even when market conditions do not predict or deliver net crop income. Defendants maintain elevated prices without concern that their competitors will try to

4

steal their market share or for potential new market entrants because high barriers to entry prevent new competitors from entering the market.

5. Evidence of Defendants' agreement and the accompanying conspiracy can be seen in the broader trends in the market. Before Defendants' agreement and conspiracy, the U.S. agriculture industry was typified by boom-and-bust cycles—the cost of crop inputs like fertilizers would fluctuate in response to market demand, weather patterns, or supply chain issues. Those factors would affect the supply of harvestable crops and thus impact the revenue generated by U.S. farmers. That market pattern changed, however, as early as 2008 when fertilizer prices steadily rose in the face of global economic volatility but failed to drop in the ensuing years.

6. Similarly, a trend over the approximately last two decades has seen prices remain high regardless of Defendants' costs.

7. NPK Fertilizer prices reached all-time highs beginning in the fall of 2021. Although this spike aligned with some favorable conditions for U.S. farmers' net income, Defendants surreptitiously leveraged concurrent global disruptions to artificially inflate NPK Fertilizer prices with no intention of returning to a market-dependent pricing scheme.

8. While net farm income decreased nearly 30% from 2022 to 2024, Defendants' profits grew by nearly 300% and NPK Fertilizer prices increased by approximately 100%.

9. In response to the burden imposed on U.S. farmers, Congress and the Department of Justice have initiated investigations into Defendants' impact on the NPK Fertilizer market and have begun to examine whether anticompetitive behavior is the cause.

10. On October 28, 2025, the U.S. Senate Judiciary Committee conducted a hearing on the issue entitled "Pressure Cooker: Competition Issues in the Seed & Fertilizer Industries." Senators spoke with U.S. farmers, small seed manufacturers, industry scholars, and TFI, seeking

answers on how to curb the rising input costs that farmers face today. Farmers and researchers alike cited massive consolidation in the fertilizer and seed industries as the reason why agricultural input costs, including NPK Fertilizers, have reached unsustainable levels.

11. This did not go unnoticed. USDA Deputy Secretary Judge Stephen Vaden participated in a webinar with the National Agricultural Law Center on January 21, 2026 where he warned that the "antitrust laws exist for a reason, and that reason is because when an industry gets too concentrated, that is to say there are too few people competing, bad things can happen that undermine free enterprise. And there are signs that that may be happening in American agriculture."

12. According to Judge Vaden, the telltale signs of antitrust violations presently occurring include "the duopoly that is Mosaic and Nutrien and their successful efforts over the past several years to constrain fertilizer supply in this country and drive up the costs that farmers are paying." Vaden added that these two Defendants were able to "constrain the supply of so many fertilizers our farmers depend" upon such that "they were able to get pricing power."

13. Earlier this year, the Department of Justice began investigating the U.S. fertilizer market for possible price fixing and is looking into multiple Defendants' business practices.

14. Through the conduct described herein, Defendants have materially reduced or eliminated the historical boom-and-bust cycle of the agriculture industry and fixed fertilizer prices during a period of rapidly falling input costs by, *inter alia*, coordinating prices among them.

6

## II. PARTIES

### A. Plaintiffs

15. Plaintiffs Robert and Donna Koon d/b/a Edge-Wood Dairy are independent dairy farmers located in Berryville, Virginia. Plaintiffs purchased NPK Fertilizer directly from at least one Defendant and has suffered antitrust injury as a direct result of the violations alleged in this Complaint.

### B. Defendants

#### 1. Nutrien

16. Defendant Nutrien Ltd. ("Nutrien") is a publicly traded Canadian company with its principal place of business at 211 19th Street East, Suite 1700, Saskatoon, Saskatchewan, Canada, S7K5R6.

17. Nutrien is "the largest upstream fertilizer producer globally, with extensive midstream distribution capability." Nutrien boasts that with its "advantaged position across the ag[ricultural] value chain," Nutrien "can anticipate trends, respond faster and more effectively produce and distribute the products and services that farmers need."

18. Defendant Nutrien AG Solutions ("Nutrien AG") is a wholly owned subsidiary of Nutrien. Nutrien AG's headquarters is located at 3005 Rocky Mountain Avenue, Loveland, Colorado 80538.

19. Defendants Nutrien and Nutrien AG together are referred to as "Nutrien" unless otherwise indicated.

### 2. Mosaic

20. Defendant The Mosaic Company ("Mosaic") is a Florida company with its principal place of business located at 101 East Kennedy Blvd., Suite 2500, Tampa, Florida 33602. Mosaic is a leading producer and marketer of potash and phosphate fertilizer.

21. Defendant Mosaic Fertilizer, LLC ("Mosaic Fertilizer) is a limited liability company incorporated in Delaware with its principal place of business located at 12800 Whitewater Drive, Suite 200, Minnetonka, Minnesota 55543. Mosaic Fertilizer is a subsidiary of Mosaic and produces fertilizer.

22. Defendants Mosaic and Mosaic Fertilizer together are referred to as "Mosaic" unless otherwise indicated.

### 3. Canpotex

23. Defendant Canpotex is a Canadian company with its principal place of business at 409 Third Avenue South, Suite 700, Saskatoon, Saskatchewan, Canada S7K5R5. Canpotex is one of the world's largest potash exporters.

24. Canpotex Ltd. ("Canpotex") is a joint venture that is wholly owned by Defendants Mosaic and Nutrien. with each shareholder having an equal ownership in the company.

### 4. CF Industries

25. Defendant CF Industries Holdings, Inc. ("CFIH") is incorporated in Delaware and has its principal place of business in Illinois. CFIH's headquarters is located at 2375 Waterview Drive, Northbrook, Illinois, 60062.

26. Defendant CF Industries, Inc. ("CF Industries") is a wholly owned subsidiary of CFIH and is incorporated in Delaware, with its principal place of business located at 2375 Waterview Dr., Northbrook, Illinois.

8

27. Defendants CFIH and CF Industries are together referred to as "CF Industries" unless otherwise indicated.

### 5. Yara

28. Defendant Yara International ASA ("Yara") is a publicly traded Norwegian company with its principal place of business at Drammensveien 131, Oslo, Norway, NO-0277.

29. Yara is leading producer of fertilizers, including NPK Fertilizers, which Yara markets and distributes globally.

30. Defendant Yara North America, Inc. ("Yara NA") is a wholly owned subsidiary of Yara. Yara NA is headquartered at 100 North Tampa Street, Suite 3800, Tampa, Florida 33602.

31. Defendants Yara and Yara NA together are referred to as "Yara" unless otherwise indicated.

### 6. Koch

32. Defendant Koch. Inc. formerly known as Koch Industries, Inc. ("Koch") is incorporated in Kansas. Koch's principal place of business located at 4111 East 37th Street North, Wichita, Kansas, 67220.

33. Defendant Koch Ag & Energy Solutions, LLC ("KAES") is a wholly owned subsidiary of Koch. KAES' headquarters are located at 4111 East 37th Street North, Wichita, Kansas, 67220.

34. Defendant Koch Fertilizer, LLC ("Koch Fertilizer") is a subsidiary of KAES. Koch Fertilizer's principal office is located at 12747 Olive Blvd., Suite 300, St. Louis, Missouri 63141. Koch Fertilizer and its affiliates hold themselves out as "one of the world's largest producers and marketers of fertilizer."

35. Defendant Koch Agronomics Services, LLC ("KAS") is a subsidiary of KAES. KAS' headquarters is located at 4111 East 37th Street North, Wichita, Kansas, 67220. KAS is a

9

global company and fertilizer producer that holds itself out as a "global provider of value-added solutions for the agriculture . . . market[]."

36. Defendants Koch, Koch Fertilizer, and KAS are collectively referred to as "Koch" unless otherwise indicated.

37. At all relevant times, each of the Defendants, or its wholly owned or controlled subsidiaries or affiliates, sold NPK Fertilizers in interstate commerce to purchasers in the United States.

38. Each of the Defendants sold NPK Fertilizer in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

## C. AGENTS AND CO-CONSPIRATORS

### 1. OCI Global

39. OCI N.V. ("OCI Global") is a publicly traded Dutch company, headquartered in Amsterdam, Netherlands. OCI Global produces and distributes nitrogen fertilizer. In 2013, OCI Global developed the Iowa Fertilizer Company as one of the largest private sector construction projects in Iowa's history and the first world-scale, greenfield nitrogen fertilizer plant built in the United States in over 25 years.

40. On December 18, 2023, OCI Global and Defendant KAES entered into a $3.6 billion agreement for the sale of 100% of OCI Global's equity interests in Iowa Fertilizer Company to KAES (the "Wever Acquisition"). The divestment was successfully completed on or before August 29, 2024.

41. In announcing the deal, KAES President Mark Luetters noted that Koch has invested $2 billion in North American fertilizer production facilities over the past 15 years.

42.    As illustrated in Figure 1, the Wever Acquisition led to an increase in Koch's total production capacity in the nitrogen fertilizer market.



**Figure 1**[1]

43.    During the Class Period, OCI Global and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, sold NPK Fertilizer in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

### 2.    BHP

44.    BHP Group Limited ("BHP") is a publicly traded Australian company, headquartered in Melbourne, Australia. BHP produces "essential commodities" through assets including potash. BHP holds interest in potash through wholly owned and operated ventures and through joint ventures not operated by BHP.

---

[1] StoneX, January '24 Farmer Fertilizer Focus – NH3 (Dec. 26, 2023), https://www.stonex.com/en/insights/january-24-farmer-fertilizer-focus-nh3//.

45.     BHP operates a potash mine in Saskatchewan, Canada, (known as "Jansen"), which is expected to begin production in mid-2027. Once fully operational, Jansen will "become one of the world's largest potash mines." BHP does not currently sell fertilizer in the United States but has targeted the United States as a market for future Jansen potash production.

46.     J.R. Simplot Company ("Simplot") is a privately held company incorporated in Nevada and headquartered in Boise, Idaho. Simplot is an international agricultural and food company whose portfolio includes phosphate mining and fertilizer manufacturing.

47.     During the Class Period, Simplot and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold NPK Fertilizer in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

### 3.     Trade Associations

48.     The Fertilizer Institute ("TFI") is a trade association for fertilizer manufacturers located at 4201 Wilson Boulevard, Suite 700, Arlington, Virginia 22203. TFI is a membership association that claims to be "the voice of the fertilizer industry" which "truly represents every segment of the fertilizer supply chain."

49.     At all relevant times, TFI acted as a co-conspirator of Defendants by facilitating the sharing of confidential, proprietary, and competitively sensitive information among them.

50.     The International Fertilizer Association ("IFA") is a global fertilizer association incorporated and registered in the United Kingdom and headquartered in Paris, France. IFA's registered office is located at Confederation House, East of England Showground Peterborough, Cambridgeshire PE2 6XE, United Kingdom. IFA is a membership association comprised of "all actors in the fertilizer value chain."

12

51. Members of IFA "decide together on areas of common interest, joint actions and positions on emerging and complex issues facing the [fertilizer] industry today." IFA membership benefits include access to an industry data sharing platform and to events.

52. At all relevant times, IFA acted as a co-conspirator of Manufacturer Defendants by facilitating the sharing of confidential, proprietary, and competitively sensitive information among them.

## III.    JURISDICTION AND VENUE

53. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) as this action alleges violations of Sections 1 of the Sherman Act, 15 U.S.C. § 1, that are actionable under sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 22 & 26.

54. The Court has personal jurisdiction over each Defendant pursuant to Federal Rule of Civil Procedure 4(k) and 15 U.S.C. § 22, which permits a lawsuit to be filed against a corporation in any district where the corporation may be found or transacts business and allows all process in such cases to be served in any district where the corporation may be found.

55. Defendants transact business in this District, maintain substantial contacts with the United States, including this District, and/or engaged in an antitrust conspiracy directed at persons residing in, located in, and/or doing business in the United States, including in this District, that had the intended effect of causing injury to such persons.

56. Defendants' conduct as described herein was intended to and did have direct, substantial, and reasonably foreseeable effects on interstate commerce in the United States, including in this District. Defendants sell their products in the continuous and uninterrupted flow of interstate commerce, including in, into, and from this District.

13

57. Venue is appropriate within this district as Defendants transact business here, and under 15 U.S.C. § 15(a), 15 U.S.C. § 22, and 28 U.S.C. § 1391(b). Further, Defendants and/or their agents may be found in this district.

## IV. FACTUAL ALLEGATIONS

### A. NPK Fertilizers

58. Nitrogen (N), phosphorus (P), and potassium (K) are the primary "macronutrients" upon which modern farming depends. Industrialized agriculture utilizes NPK Fertilizers to promote rapid seed growth and healthy crop development. Farmers may apply NPK Fertilizers individually or in blended formulations, often labeled with three numbers corresponding to the percentages of each nutrient.

#### 1. Nitrogen Fertilizers

59. Nitrogen is necessary for plant growth and helps crops manufacture proteins and boosts crop yields. The nutritional quality of food depends heavily on an adequate nitrogen supply.

60. The lack of bountiful reactive nitrogen was a limiting factor in crop production until the twentieth century, when chemists Fritz Haber and Carl Bosch developed an industrial-scale method to convert atmospheric nitrogen into reactive nitrogen suitable for plants. This method of developing synthetic nitrogen is known as the "Haber-Bosch process" and serves as the foundation of the modern production of synthetic nitrogen fertilizer.

61. As illustrated in Figure 2, roughly half of our global food production today depends on synthetic nitrogen.

14



**Figure 2**[2]

62.     Widely used nitrogen fertilizers include (a) ammonium nitrate, ammonium sulfate, and urea, formulated as solid granules (also referred to a "prills"); or (b) urea ammonium nitrate (UAN) solution, formulated as a liquid. The nitrogen concentration and form vary among fertilizers, but all types are ultimately absorbed as nitrate or ammonium ions by the plant.

63.     Barriers to entry into the synthetic nitrogen industry are high and cost-prohibitive for new market participants. A new nitrogen facility can cost approximately $5 billion to construct.

---

[2] Our World in Data, *World Population Supported by Synthetic Nitrogen Fertilizers*, OUR WORLD IN DATA, https://ourworldindata.org/grapher/world-population-supported-by-synthetic-nitrogen-fertilizers, last visited April 17, 2026.

### 2. Phosphate Fertilizers

64. Phosphate plays a vital role in how plants convert sunlight into energy and supports photosynthesis and energy transfer, root development and seed formation, cell division, cell enlargement, and the transfer of genetic information.

65. Phosphate-based fertilizers come from phosphate rock, a naturally occurring mineral mined from geologic deposits. The rock is treated with sulfuric acid to release phosphorus and produce phosphoric acid. When combined with ammonia and sulfur, phosphoric acid can create various liquid and dry fertilizer products, including monoammonium phosphate (MAP), diammonium phosphate (DAP), and triple superphosphate (TSP).

### 3. Potash Fertilizers

66. Plants need potassium to grow stronger, withstand drought stress, fend off insects and disease, use water more efficiently, and improve yield and quality. When plants have adequate potassium, they are healthier, more resilient, and more productive.

67. Potassium-based fertilizers originate from potassium chloride, also known as potash. Potash is mined from geological deposits of evaporite minerals. After potash is mined, it is refined into different fertilizer products and shaped into small, uniform granules so farmers can apply it easily and plants can absorb the nutrients more efficiently.

### B. Defendants' Conspiracy Caused Significant Price Increases to NPK Fertilizers

68. The rising consolidation of fertilizer manufacturers began in the early 1980s, when dropping commodity markets caused one-sixth of American farmland to go out of production and demand for fertilizer plummeted. This drop in demand, combined with an increase in input costs for producing fertilizer, led to closed production plants and the exit of many small fertilizer firms.

16

69.     Steady consolidation in the market continued until there was a drastic increase in fertilizer prices in 2008; following the global financial crisis, however, prices again dropped. The number of manufacturers in the nitrogen fertilizer market fell from 46 to 13 between 1984 and 2008, a 72% reduction.



**Figure 3**

70.     By 2012, four companies controlled 75% of the nitrogen market, three companies controlled 90% of the phosphorus market, and nearly 90% of potash was imported from Canada, where production was controlled by three firms. Fertilizer prices gradually declined again from 2013 through 2020.

71.     Beginning in 2020, fertilizer prices have steadily risen—increasing 37% between 2020 and 2025. Fertilizer prices soared in 2021, where the wholesale fertilizer index increased more than 60% in comparison to 2020 levels, with nitrogen levels jumping 95% and potash rising over 70%.

17



**Figure 4**[3]

72. From the fall of 2021 through spring of 2022, NPK Fertilizer prices were at an all-time high.

73. During the last quarter of 2021, the price of nitrogen-based fertilizers anhydrous ammonia, urea, and liquid nitrogen, increased 210%, 155%, and 159%, respectively; phosphate-based fertilizers, diammonium phosphate (DAP) and monoammonium phosphate (MAP), increased 100% and 125%, respectively.

74. Likewise, during the last quarter of 2021, Potash rose over 134%.

75. In April 2022, monoammonium phosphate hit an all-time high at over $1,000/ton.

76. These increases led to an estimated $128,000 increase in farmer-borne costs per feed-grain-operation farm in 2022. For example, Iowa corn farmers report an increase in

---

[3] American Soybean Association, *Soybeans Without a Buyer: The Export Gap Hurting U.S. Farms* (Aug. 20, 2025), https://soygrowers.com/news-releases/soybeans-without-a-buyer-the-export-gap-hurting-u-s-farms/.

production costs of $238 per acre since 2020. Corn sales required to purchase one unit of MAP increased from an average of 136 bushels to 230 bushels.

77.     Meanwhile, Nutrien's gross manufacturing profit margin increased 669% from 2020 and its profits increased 142%. Yet its costs of goods sold increased by only 58%.

78.     During the same time, Mosaic's profits increased 120%, and CF Industries' profits increased 212%.



**Figure 5**

79.     Although world events such as the Covid-19 pandemic, fertilizer export restrictions in China, and Russia's war on Ukraine could explain some market fluctuation, the rising prices in the fertilizer industry and Defendants' extreme profit margins cannot be explained by traditional market factors. Defendants continue to extract supracompetitive margins regardless of extenuating circumstances while imposing rising costs on U.S. farmers and, in turn, American consumers.

19

80. Consumer prices have declined significantly since the 2021-22 spike, but fertilizer prices remain significantly higher than pre-2022 levels. In 2024, the U.S. NPK Fertilizer market was valued at almost $30 billion.

81. Over the past decade, phosphate prices have increased by 60%, with the price of potash rising nearly 10% in 2025 alone. As of October 2025, the price of MAP per metric ton was $790/mt in the United States compared to $680/mt in Brazil, reflecting a structural premium of $150–$200 per metric ton.

### C. Recent Price Inflation of the NPK Fertilizer Market Does Not Align with Market Trends

82. Massive consolidation in the NPK Fertilizer Market has allowed Defendants to fix and sustain inflated prices. Over the past two decades, fertilizer prices have consistently increased despite other market factors.

83. Although fertilizer prices remained largely stable from the late 1980s through about 2004, fertilizer prices saw a dramatic increase in 2008. Nitrogen prices doubled while phosphorus and potash prices tripled. This rate of increase in fertilizer cost far exceeded costs associated with manufacturing fertilizer or other crop production costs.

84. Fertilizer prices again peaked in 2012 but gradually fell until the fall of 2021 when nitrogen fertilizer prices doubled, reaching a record high of $1,300 per ton by the spring of 2022. Nitrogen fertilizer prices doubled at this time and were consistently higher than prices for other nitrogen chemical products, compared to before 2021.

85. This extreme price spike is evidence of Defendants' collusion. Defendants leverage the global nature of the fertilizer industry to exploit farmers, like Plaintiffs, and fix prices.

20

86. Both statistical and anecdotal evidence support this trend. When a globally disruptive event occurs—for example, the COVID-19 pandemic, Russia's war on Ukraine, and most recently, military strikes on Iran—Defendants uniformly spike fertilizer prices under the guise of supply-chain disruptions.

87. Anecdotally, in recent years, U.S. farmers report calling fertilizer suppliers during a globally recognized event only to be told that pricing information is unavailable and they need to call back later, or the price given on the phone is only valid for the duration of the call and may rise later in the day.

88. Curiously though, prices never fall after global tensions ease. What's more, farmers report experiencing price spikes on fertilizers that should not be impacted by global supply chain disruptions because they are (a) produced domestically or (b) already sitting in U.S. warehouses.

89. Although an analysis of pricing data may support a correlation between NPK Fertilizer price increases and periods of global market volatility triggered by disruptive external events, such as the COVID-19 pandemic, Russia's war on Ukraine, and military strikes on Iran, no comparable correlation exists between these elevated prices and U.S. domestic demand for fertilizer or fluctuations in crop output and sales; to the contrary, NPK Fertilizer prices have remained artificially elevated even as net farm income declined and crop returns fell.

90. In numerous cases, the post-pandemic relationship between fertilizer prices and demand factors decouple. Put differently, the two data points move independent of one another or even in opposite directions.

91. In 2021, overall agricultural market trends similarly supported increased NPK Fertilizer prices. U.S. farmers generally reported strong crop returns in 2021 due to high global demand and low competitor supply caused by unfavorable weather conditions in South Africa.

21

92. However, when the market conditions inverted, pushing crop prices to record nominal levels for the 2022-2023 market year, fertilizer costs remained high while U.S. farmers experienced substantial price decreases in corn and soybean yields.

93. Entering 2023, the University of Missouri predicted that farmers would experience a net farm income decrease of 14% in Missouri while the overall U.S. net farm income would decrease by 19%.

94. As corn and soybean prices continually dropped between 2023 to 2024, Missouri farmers predicted a $0.43 billion decrease in 2023 followed by a $1 billion decrease in 2024. Similarly, between 2022 to 2024, cash receipt for crop production in Iowa fell by 26%.

95. In contrast, as U.S. farmers experienced a net farm income decrease of nearly 30%—from 182 billion in 2022 to 127.5 billion in 2024—Defendants' corporate profits increased nearly 300% and NPK Fertilizer prices doubled.

96. In October 2025, Iowa farmer Noah Coppess explained to the United States Senate Judiciary Committee that although farm production inputs and commodity prices increased, production costs have hardly declined, and costs of crop inputs (such as seeds, fertilizers, and pesticides) increased 66%.

97. NPK Fertilizer prices rise quickly with crop prices in the United States, but do not follow the same declining trend when crop prices fall. This lack of alignment in downward trends highlights the anticompetitive nature of Defendants' pricing practices.

98. Furthermore, while fertilizer prices increased post-2021, producers did not subsequently increase their production. For example, market leader CF Industries' shipment volumes among four fertilizers in fact declined during the period when the average prices of these

fertilizers increased, indicating the potential that excess capacity was maintained during this period.



**Figure 6**

**D.     Increases in natural gas prices indicate only a nominal correlation to rising and sustained NPK Fertilizer costs**

99.     To the extent that Defendants attempt to explain the skyrocketing cost of fertilizer over the past several years by citing the rising cost of natural gas, they omit pertinent data that indicates NPK Fertilizer prices have risen to an amount much higher than that of gas.

100.     In a competitive market, prices are determined by the cost to supply a good and the willingness of a consumer to pay. A manufacturer of a good would not benefit from unilaterally raising a price in a competitive market, because consumers could simply switch to a lower-priced competitor. Thus, a sudden change in the price of goods implies either a "shock" to supply or demand conditions, or a change in competitive conditions between firms.

23

101. Between around 2021 and 2023, the market experienced an increase in the cost of natural gas. Natural gas is an important input in fertilizer production, and so a rise in natural gas prices would likely prompt some increase in the price of fertilizer even in the absence of collusive conduct. Insofar as an external market shock forced Defendants to increase their NPK Fertilizer prices to cover natural gas costs, the natural consequence would be falling profit margins during the period of the supply disruption. The publicly available data, however, indicates the opposite: the period of natural gas price increase is associated with higher profit margins among Defendants.

102. Cost shocks can act as a coordination mechanism, allowing firms to establish a high collusive baseline price without drawing suspicion. A cartel can set prices higher than the shock actually warrants or maintain higher prices through collusion rather than resuming competition as costs return to normal.

103. Thus, in evaluating whether the price hikes observed in this case are evidence of collusive conduct, the relevant inquiry looks to the extent to which those shocks adequately explain the initial price increases and subsequent price levels, is not whether any external shocks occurred at all. And here, the shocks lack an adequate explanation.

104. Moreover, Defendants hedge against input costs shocks. CF Industries confirms as much in multiple financial statements:

- CF Industries' 2024 Annual Report stated: "From time to time, we utilize natural gas derivatives to hedge our financial exposure to the price volatility of natural gas, the principal raw material we use in the production of nitrogen-based products. We may use natural gas futures, swaps and option contracts traded in over-the-counter markets or on exchanges. In addition,

from time to time, we may use fixed-price, physical purchase and sales contracts to hedge our exposure to natural gas price volatility."

- CF Industries' 2024 Q1 Results indicated: "For the three months ended March 31, 2024, we used derivatives to cover approximately 55% of our natural gas consumption."

- In 2025, CF Industries stated: "The average cost of natural gas, including the impact of realized derivatives, reflected in the Company's cost of sales was $3.52 per MMBtu in the first half of 2025 compared to the average cost of natural gas in cost of sales of $2.53 per MMBtu in the first half of 2024."

105. Indeed, the data confirms that CF Industries maintained elevated profits even after natural gas prices declined:



**Figure 7**

106. Defendants use the rising cost of natural gas to mislead the public as to Defendants' multiple opportunities to collude and permit price fixing at rates untethered to natural gas prices.

**E.    The U.S. NPK Fertilizer Market is Marked by Indicia of Collusion**

107.    The U.S. NPK fertilizer market is highly concentrated and dominated by just three companies: Nutrien, Mosaic, and CF Industries. Together, they account for the majority of U.S. sales of NPK Fertilizer, giving these Defendants control over the national market.

108.    High market concentration increases the likelihood of collusion and other anticompetitive practices. An industry dominated by a few companies allows for easier coordination of price increases, territorial allocation, and information sharing.

109.    Over time, Defendants have leveraged the concentrated market to maintain supra-competitive prices.

110.    As USDA Deputy Secretary Judge Stephen Vaden correctly acknowledged, Mosaic and Nutrien have successfully constrained "the supply of so many fertilizers our farmers depend on" to secure "pricing power."

111.    In addition to high market concentration, the NPK Fertilizer market in the United States in marked by numerous indicia of collusion, including the exchange of confidential information (and the opportunity to do so); high barriers to entry; inelastic demand; and motive and opportunity to fix prices.

**F.    Defendants exchange confidential, competitively sensitive, proprietary information through IFA and TFI**

**1.    IFA**

112.    The IFA is "the only global fertilizer association." Its members include organizations at all levels of the fertilizer supply chain: fertilizer producers, traders and distributors, as well as their associations, service providers to the industry, research organizations, agtech start-ups and non-governmental organizations.

26

113. As of March 2026, IFA Board members included multiple Defendants. Kenneth Seitz, Nutrien's President and CEO, is the current Association Chair of the IFA Board, and this two-year position was previously filled by CF Industries' then-President and CEO, Tony Will. Other Manufacturer Defendant Board members include Svein Tore Holsether, President and CEO of Yara; Bruce Bodine, formerly Mosaic's Senior Vice President and currently its President and CEO; and Chris Bohn, current President and CEO of CF Industries.

114. Nearly all Defendants and co-conspirators named in this Complaint are members of IFA, including CF Industries, KAES, KAS, Koch Fertilizer, Mosaic, Mosaic Fertilizer, Nutrien, Nutrien Ag, and Yara NA. Co-conspirators BHP, J.R. Simplot Co., and TFI are also members of IFA. Members of Defendants' leadership maintain permanent seats on IFA's Board of Directors, including Kenneth Seitz, Nutrien's President and CEO, Bruce Bodine, The Mosaic Company's President and CEO, and Chris Bohn, CF Industries President and CEO.

### a. *IFA Market Intelligence Data*

115. Since June 2018, IFA has generated a data collection program known as IFSTAT.

116. In IFA's own words, "IFASTAT is the leading source of fertilizer and raw materials statistics in the world. Compiled by IFA's Market Intelligence team, IFASTAT is a one-stop shop for the most comprehensive statistical information on fertilizers and raw materials supply and fertilizer consumption."

117. IFASTAT promises users access to, among other things, (a) 70 years of global fertilizer data, (b) 15 plus years of "supply, production & trade data," and (c) regular market analysis.

27





**WHY BECOME A MEMBER?**
Be part of a global network shaping the future of plant nutrition. IFA membership gives you:
**Influence:** Help set industry priorities and strategies.
**Expert Access:** Tap into deep knowledge across global markets, science, policy and sustainability.
**Connections:** Join committees and events to grow your network and your business.

**DATA & INTELLIGENCE**

**IFASTAT** is your go-to for global fertilizer data:
- 15+ years of supply, production & trade data
- 70 years of nutrient consumption insights
- Regular market analysis and outlooks
- Country profiles, nutrient efficiency stats, and more

**CONFERENCES & EVENTS**

IFA hosts top-tier global gatherings, including **conferences and events**:
- **Annual Conference** – Industry's flagship networking event
- **Cultivating Tomorrow** – Innovation meets sustainability
- Regional and thematic fora on markets, innovation, sustainability and more (Global Markets Conference, Crossroads Asia-Pacific Conference, Strategic Forum)

**DRIVING SUSTAINABILITY**

We provide:
- Production **certification, benchmarks** and **roadmaps**
- Safety, circular economy and decarbonization **initiatives**
- **Training** via the **Sustainable Fertilizer Academy**
- **Awards** recognizing excellence in safety, health and environment

**Figure 8[4]**

118. The data in IFASTAT is organized into two categories: supply and consumption.

119. Consumption data is accessible to the public, while supply data is available only to members.

120. Supply data includes "production and trade detailed data from 2002 onwards by product and/or country . . . ." Information is presented to users in database and chart form, along with reports, factsheets, and webinars.

121. A key feature of IFASTAT data is its Market Outlook reports. Only IFA members may access the medium-term and short-term supply and demand detailed Market Outlook Reports prepared by the IFA Secretariat, but the public may view summaries of these reports. IFA members also receive exclusive access to quarterly Fertilizer Market Update reports.

---

[4] International Fertilizer Assoc., *Join IFA: Together, We Help to Feed the World Sustainably*, https://www.fertilizer.org/wp-content/uploads/2024/06/2025_IFA_Membership_Flyer_English.pdf (last visited April 17, 2026).

122. Other member-exclusive information on IFASTAT include webinars, product factsheets, country-specific supply reports, and country-specific factsheets. The public may view information on a regional level, but not on a product or country level.

### b. *IFA Meetings Presented Defendants the Opportunity to Collude*

123. According to IFA, its "events facilitate the sharing of information and best practices."

124. One such event is the IFA Annual Conference, a "flagship where all the key fertilizer players gather to network and learn about the latest developments in the industry."

125. Additionally, IFA coordinates annual regional events to promote industry "cooperation."

### 2. The Fertilizer Institute

126. At least one entity from every group of Defendants is an active member of TFI. This includes Nutrien, CF Industries, KAS, Koch Fertilizer, Yara NA, and Mosaic.

127. As of March 2026, TFI Board members included the following Defendants: Bruce Bodine, President and CEO of Mosaic; Chris Bohn, President and CEO of CF Industries; Scott McGinn, Executive VP of Koch Fertilizer; Sabine Schröder, Interim President of Yara NA; and Kenneth Seitz, President and CEO of Nutrien.

### a. *TFI Market Intelligence Data*

128. TFI encourages fertilizer manufacturers to become members for access to exclusive "market intelligence data," statistical reports and surveys, and annual membership meetings.



**Figure 9**[5]

129.    According to TFI, one of its key member benefits includes "access to trusted information and data." It specifically promises that manufacturer members will receive "access to member-only content and market intelligence data."

130.    TFI restricts public access to its information. The data is stored and available in a secure, members-only section of the website.

131.    Documents available on TFI's website tout the benefits of membership, including that it is "[t]he sole source of the fertilizer industry data you need for your business." TFI supports this assertion by promising "Members-Only Market Volatility Information & Resources."

132.    The members-only fertilizer industry data that TFI collects and distributes includes:

- The Fertilizer RECORD: monthly data (released quarterly) on production, producer inventories, and producer disappearance;

- Fertilizer Imports and Exports: "Monthly fertilizer trade data (quality and value) . . .;" and

---

[5] The Fertilizer Institute, Market Intelligence Insights, https://www.tfi.org/insights/market-intelligence-insights/#:~:text=About%20the%20U.S.%20Fertilizer%20Market,in%20excess%20of%20$34%20billion (last visited April 17, 2026).

Case 4:26-cv-00418-BCW    Document 1    Filed 05/14/26    Page 30 of 46

- Report on U.S. exports of combined diammonium phosphate (DAP) and monoammonium phosphate (MAP) by country of destination on a monthly, calendar year-to-date and fertilizer year-to-date basis.

133. Members-only Market Intelligence Resources include analytical data on the fertilizer market, and flyers about:

- Market Volatility Key Takeaways;

- Fertilizer Market Volatility Talking Points;

- Fertilizer Market Volatility White Paper; and

- TFI Coverage of USDA's Monthly Agricultural Prices Reports

134. TFI members also receive exclusive access to webinars, for example, "Navigating 2026: The Changing Landscape of the Fertilizer Market."

135. TFI also promotes its ability to "leverag[e] the power of a unified industry voice" to promote membership among fertilizer manufacturers.

136. TFI is not open to the public. Rather, membership in TFI is awarded through an application and interview process. TFI has different levels of membership, and only certain memberships are afforded full access to participate in certain TFI committees.

137. Membership offerings are either (a) Regular Members, for those who sell or plan to sell fertilizer products within the United States, or (b) Associate Members, those who don't sell fertilizer "but provide products or services to the fertilizer industry."

138. Only Regular Members are afforded full access to participate in TIF committees. One benefit all members receive is "[a] direct voice in shaping the future of the fertilizer industry."

**b.      *TFI Meetings Presented Defendants the Opportunity to Collude***

139.    In addition to providing private market data, TFI organizes multiple meetings and events each year to give members "a seat at the table" and allow "a network of industry peers . . . to stay informed and engaged" with one another.

140.    During these meetings, TFI connects members of the fertilizer supply chain to "deepen[] business relationships." At TFI's Annual Business Conference, certain events over the course of the conference are "by Invitation only."

141.    Additionally, CF Industries, Koch Fertilizer Canada, ULC, Mosaic, Nutrien and Yara NA are members of the Board of Fertilizer Canada, a Canadian fertilizer organization headquartered in Ottawa, Canada.

**G.      The NPK Fertilizer market is characterized by inelastic demand**

142.    As detailed above, the NPK Fertilizer market is also highly inelastic, which makes it easily susceptible to cartel and other anticompetitive behavior.

143.    When demand is inelastic, increases in price do not meaningfully reduce the quantity purchased, allowing firms engaged in collusion to raise prices without risking significant loss of sales.

144.    Demand for NPK Fertilizers is inelastic because NPK Fertilizers provide the macronutrients necessary to sustain crop production. For humanity to survive, we depend on industrialized agriculture and crop farming, which in turn depends on replenishing nutrient rich soil with fertilizers. U.S. farmers must replenish the soil with fertilizers every year, sometimes multiple times throughout the year.

145.    Buyers of NPK Fertilizer like Plaintiffs are more vulnerable to collusion among Defendants, who are able to raise prices without fearing lost sales or substitution.

**H.     The NPK Fertilizer market has high barriers to entry**

146.    Competition is further restrained in the NPK Fertilizer market due to extremely high barriers to entry. Fertilizer production requires significant capital investment. For example, a new nitrogen facility can cost approximately $5 billion to construct.

147.    There are also other high fixed costs associated with entering the market, as production is capital-intensive. For example, Nutrien and CF Industries, the largest two producers of nitrogen fertilizer, control multiple distribution networks as well as fertilizer inputs and logistics channels, making it challenging for new entrants in the market to gain share. This offers them an easy way to exclude potential rivals and maintain their cartel.

148.    There are no economically viable substitutes in the U.S. market for NPK Fertilizer, which further enhances Defendants' market power and domination.

**I.     Nitrogen fertilizer products are highly homogenous**

149.    There are five main distinct types of nitrogen fertilizers: Urea, Ammonium Nitrate, Ammonium Sulfate, Calcium Ammonium Nitrate, and Anhydrous Ammonia. Each type differs based on its nitrogen concentration, and farmers may select a type based on their soil and plant needs. However, aside from a few unique formulations available on the market, the core products in this market are homogenous if not fungible.

**J.     Defendants also have motive and the opportunity to collude**

150.    In a competitive market, there would be price competition which would, absent collusion, create an incentive for each player to set prices that would undercut those of its rivals. Instead, Defendants follow one another's pricing closely in terms of both level and movement, which is suggestive of price fixing.

33

151. Figure 10 below compares Nutrien's and CF Industries' respective prices for nitrogen (ammonia) fertilizer between 2017 and 2025:



**Figure 10**

152. These rising prices do not correspond to Defendants' costs. For example, for the largest producer of nitrogen fertilizer, CF Industries, which controls 39% of the market and is widely regarded as a price leader, costs as a percentage of revenue steadily declined since 2016, while gross profit margins increased significantly over the same period.

153. On its 2021 second quarter earnings call, CF Industries stated: "[I]n a demand-driven market, we're trading above where the cost curve economics are right now. So again, all of that provides a really great operating environment for us."

154. In 2021, CF Industries and Koch each announced fertilizer prices within two hours of one another, pricing their products within $25.

155. Defendants' networks of relationships also include at least two joint ventures: Koch Industries and CF Industries operate a joint venture in Trinidad-based Point Lisas Nitrogen Limited, and Canpotex is a joint venture wholly owned by Defendants Mosaic and Nutrien, each holding an equal ownership interest in the company.

34

**K. Defendants' coordinated activity suggests the formation of an NPK Fertilizer cartel**

156. The numerous plus factors available for collusion facilitated Defendants' insidious coordination of inflated NPK Fertilizer prices, suggesting the emergence of an NPK Fertilizer cartel from around 2020.

157. Figure 11 shows the coordinated profit margins of Nutrien and CF Industries, aligning with the probable start of the NPK Fertilizer Cartel:



**Figure 11**

158. Nutrien's profit on all NPK Fertilizer remained elevated after the market stabilized:



159. In fact, a similar pattern is observable for multiple Defendants. The gross profit margin remained elevated for Mosaic, Nutrien, and CF Industries.

### L. Plaintiffs and the Class Have Suffered Antitrust Injuries

160. As TFI President and CEO Corey Rosenbusch explained to the Senate Judiciary Committee, "U.S. fertilizer producers are investing billions of dollars to maintain and upgrade their facilities" every year. As a result, Defendants' dominant market positions remain protected from meaningful competitive threats.

161. Defendants' anticompetitive conduct has had the following effects, among others:

- Price competition has been restrained or eliminated with respect to NPK Fertilizers;

36

- The prices of NPK Fertilizers have been fixed, raised, stabilized, or maintained at artificially inflated levels;

- Direct purchasers of NPK Fertilizer have been deprived of free and open competition; and

- Direct purchasers of NPK Fertilizers, including Plaintiffs, paid artificially inflated prices.

162. The ultimate purpose of Defendants' conduct is to raise, fix, maintain, or stabilize the price of NPK Fertilizers and, as a direct and foreseeable result, Plaintiffs and the Class have paid supra-competitive prices for the NPK Fertilizers during the Class Period.

163. Because of the antitrust violations alleged herein, Plaintiffs and Class Members have sustained injury, having paid higher prices for the NPK Fertilizers than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result, they have suffered damages.

## V.  CLASS ALLEGATIONS

164. Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), seeking damages and injunctive relief on behalf of the following class:

> All individuals and entities who purchased NPK Fertilizers directly from any Manufacturer Defendant in the United States from January 1, 2020, until the present.

165. Excluded from the class are Defendants, their parent companies, subsidiaries, and affiliates, any co-conspirators, Defendants' officers, directors, management, employees, subsidiaries, affiliates, or agents, all state and federal governmental agencies, and any judges or justices assigned to hear any aspect of this action.

166. **Numerosity.** Plaintiffs do not know the exact number of Class members because such information is in the exclusive control of Defendants and co-conspirators. However,

according to the USDA's Farms and Land in Farms 2025 Summary, the number of farms in the United States for 2025 is estimated at 1,865,000. Further, the Class is readily identifiable from information and records in Defendants' possession.

167. **Typicality.** Plaintiffs' claims are typical of the claims of the Class in that they and Class members purchased NPK Fertilizer directly from one or more of Defendants at artificially inflated prices. Plaintiffs and all Class members were damaged by the same common course of wrongful conduct.

168. **Commonality.** Questions of law and fact that arise from Defendants' anticompetitive conduct are common to the Class, including, but not limited to the following:

- Whether Defendants and their co-conspirators engaged in a contract, combination, or conspiracy to raise, fix, maintain, or stabilize prices of NPK Fertilizer sold in the United States in violation of federal antitrust laws;

- Whether Defendants agreed to unreasonably restrain trade in violation of federal antitrust laws;

- Whether Defendants and their co-conspirators participated in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements that they reached;

- The identity of the participants of the alleged conspiracy;

- The scope and duration of the alleged conspiracy;

- The acts performed by Defendants and their co-conspirators in furtherance of the alleged conspiracy;

- The effect of Defendants' alleged conspiracy on the prices of NPK Fertilizer sold in the United States during the Class Period;

- Whether the conduct of Defendants and their co-conspirators caused injury to the business or property of Plaintiffs and other members of the Class;

- Whether Plaintiffs and other members of the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief;

- The appropriate class-wide measure of damages; and

- Whether the statute of limitations was tolled or whether Defendants fraudulently concealed the existence of their anticompetitive conduct from Plaintiffs and the Class.

169. **Predominance**. The above common questions of law or fact predominate over any questions affecting only individual class members.

170. **Adequacy.** Plaintiffs will fairly and adequately protect and represent the interests of the Class. Plaintiffs' interests coincide with, and are not antagonistic to, the interests of the Class members. Further, Plaintiffs have retained competent counsel experienced in antitrust class action and other complex litigation.

171. **Superiority.** Class action treatment is the superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons and entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that could not practicably be pursued individually, substantially outweigh potential difficulties in the management of this action as a class action.

172. Plaintiffs know of no special difficulty that would be encountered in this action that would preclude its maintenance as a class action.

173. Defendants' wrongful actions are generally applicable to the class members as a whole, for which Plaintiffs seek, *inter alia*, damages and equitable remedies.

174.    The relevant geographic market is the United States and its territories and possessions.

175.    To the extent a relevant product market needs to be defined in this action, it is the market for NPK Fertilizers. Additionally, or in the alternative, individual submarkets exist for Nitrogen Fertilizers, Phosphate Fertilizers, and Potash Fertilizers.

176.    After decades of consolidation, the U.S. market was constrained such that by 2012, four companies controlled 75% of nitrogen fertilizer and three companies controlled 90% of the phosphate fertilizer. The U.S. imports nearly 90% of its potash from Canada, where the market was under control of only three companies.

177.    By 2024, there were less than five significant producers in each NPK Fertilizer market. Nutrien, Mosaic and CF Industries control most of the U.S. NPK Fertilizer market.

178.    As illustrated by Figure 12, Defendants control approximately 82% of the North American nitrogen market, 90 to 95% of the potash market, and 91% of the phosphate market in the United States. The control of phosphate and potash is even more highly concentrated to just two Defendants: Mosaic and Nutrien.



**Figure 12[6]**

179. Nutrien claims that it is the second-largest nitrogen producer in North America, with more than 7 million tonnes of annual gross ammonia nameplate capacity.

180. Mosaic is the world's largest producer of finished phosphate products, with an annual operational capacity of approximately 16.8 million tonnes of concentrated phosphates. This capacity is greater than the next two largest phosphate producers combined.

---

[6] Farm Action, *The Fertilizer Sector Fact Shee*t, https://farmaction.us/wp-content/uploads/2024/09/Fertilizer_Farm-Action.pdf (last visited April 17, 2026).

181. In the United States, Mosaic produces over 64% of the phosphate rock mined in the United States and manufactures 80% of phosphate fertilizers produced in North America.

182. According to Farm Action, a nonpartisan, farmer-led watchdog advocating for accountability from our government and large corporations within the agricultural sector, Mosaic has control over an estimated 90% of the phosphate fertilizer market in the United States.

183. Nutrien claims to be the second-largest phosphate producer in North America.

184. Nutrien has control of approximately 55% of the North American potash fertilizer market.

185. Mosaic has control of approximately 35% of the North American potash fertilizer market.

186. Yara claims to be the world's largest producer of NPK fertilizers.

187. Market concentration in the NPK Fertilizer industry can be measured by the Herfindahl-Hirschman Index ("HHI"), a calculation that assigns a number from 0 to 10,000 to firms in an industry to quantify competition levels. The higher the HHI, the less competition exists in the industry. Scores ranging from 1,800 to 2,500 indicate high market concentration, and a score above 2,500 suggests the possibility of an oligopoly or monopoly. The NPK Fertilizer market shows extremely high levels of concentration in North America.

| Fertilizer | HHI in 2011 | | HHI in 2022 | | |
| --- | --- | --- | --- | --- | --- |
| | North America | World | United States | North America | World |
| Nitrogen | 2,107 | 964 | 2,382 | 2,242 | 368 |
| Potash | 4,604 | 1,486 | 3,455 | 4,255 | 1,011 |
| Phosphate | 3,163 | 2,447 | 4,553 | 4,533 | 152 |

A. VII. TOLLING OF THE STATUTE OF LIMITATIONS

188. By virtue of Defendants' fraudulent concealment of their wrongful conduct, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs have as a result of the unlawful conspiracy alleged in this Complaint.

189. Further, a continuing violation restarts the statute of limitations period each time Defendants commit an overt act. During the Class Period, Defendants continued to make sales of NPK Fertilizer whose prices were fixed as a result of Defendants' continually renewed and adjusted price-fixing and industry data exchange agreements.

190. Defendants' overt acts were new and independent acts that perpetuated their agreement and kept them current with market conditions. They were not merely reaffirmations of Defendants' previous acts. By constantly renewing and refining their agreement to reflect market conditions, Defendants inflicted new and accumulating injury on Plaintiffs and Class Members.

191. As the concept of a continuing violation applies to a price-fixing conspiracy that brings about a series of unlawfully high-priced sales over a period of years, each sale to Plaintiffs and Class Members starts the statutory period running again regardless of Plaintiffs' knowledge of the alleged illegality at much earlier times. This means that each illegally priced sale of NPK Fertilizer by a Defendant constituted a new cause of action for purposes of the statute of limitations.

## VII. CLAIMS FOR RELIEF

### COUNT I

### RESTRAINT OF TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### (Against All Defendants)

192. Plaintiffs repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

43

193. At least as early as January 1, 2020, and continuing through the present, Defendants and their co-conspirators entered into an unlawful and continuing contract, combination or conspiracy in unreasonable restraint of trade to artificially raise, fix, maintain, or stabilize prices for NPK Fertilizers in the United States to supra-competitive levels, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

194. Defendants have contracted, combined, and conspired to raise, fix, maintain, and/or stabilize the prices of NPK Fertilizer sold directly to purchasers in the United States.

195. Defendants have shared competitively sensitive confidential information that enable coordinated non-competitive conduct on pricing and output.

196. Because Defendants are direct competitors in the NPK Fertilizer market, this conduct is *per se* unlawful under the Sherman Act.

197. Defendants' conduct is also unlawful under a rule of reason or quick look analysis because Defendants' agreement is anticompetitive with no valid procompetitive justification. Even if valid procompetitive justifications existed, such justifications could have been reasonably achieved through less restrictive means of competition.

198. The contract, combination, or conspiracy alleged herein has had the following effects, among others:

- Price competition in the sale of NPK Fertilizers has been restrained, suppressed, and /or eliminated in the United States;

- Prices for NPK Fertilizer sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high, non-competitive levels throughout the United States; and

- Those who purchased NPK Fertilizers from Defendants or their co-conspirators have been deprived of the benefits of free and open competition.

199. Plaintiffs and Class Members have been injured and will continue to be injured by paying artificially inflated prices for the NPK Fertilizers purchased from Defendants or their co-conspirators than they would have paid and will pay in the absence of the contract, combination, or conspiracy.

## VIII.  DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff, on behalf of itself and the proposed Class, respectfully demands that this Court:

A. Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the class, and declare the Plaintiffs as representatives of the Class;

B. Enter joint and several judgments against Defendants and in favor of the Plaintiffs and members of the proposed Class;

C. Award to the Plaintiffs and the members of the proposed Class damages (i.e., three times overcharges) in an amount to be determined at trial, plus interest in accordance with law;

D. Award to the Plaintiffs and the members of the proposed Class their costs of suit, including reasonable attorneys' fees, as provided by law;

E. That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the federal and state laws set forth above;

F. That the Court issue appropriate injunctive and other equitable relief against Defendants; and

G. Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## IX.    JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  May 14, 2026

Respectfully submitted,

/s/   Bryan T. White
Bryan T. White (MO 55805)
Gene P. Graham, Jr. (MO 34950)
**WHITE, GRAHAM, BUCKLEY, & CARR, LLC**
19049 East Valley View Parkway, Ste. C
Independence, Missouri 64055
Tel: (816) 373-9080
Fax: (816) 373-9319
ggraham@wagblaw.com
bwhite@wagblaw.com

Joseph J. DePalma*
**LITE DEPALMA GREENBERG & AFANADOR, LLC**
570 Broad Street, Suite 1201
Newark, NJ 07102
(973) 623-3000
jdepalma@litedepalma.com

Laura K. Mummert*
Steven J. Greenfogel*
**LITE DEPALMA GREENBERG & AFANADOR, LLC**
1515 Market Street, Suite 1200
Philadelphia, PA 19102
(267) 314-7980
lmummert@litedepalma.com
sgreenfogel@litedepalma.com

*Attorneys for Plaintiffs and the Putative Class*

* Pro Hac Vice Forthcoming

46